IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PAUL FRY, | : | |
|     Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| OFFICER W. CLAY SMOKER and | : | |
| MANOR TOWNSHIP, | : | No. 11-3015 |
|     Defendants. | : | |

<u>MEMORANDUM</u>

**Schiller, J.**      May 9, 2012

    Plaintiff Paul Fry brought this action against Manor Township Police Officer W. Clay Smoker, individually and in his official capacity, under 42 U.S.C. § 1983 claiming Officer Smoker used excessive force, and against Manor Township for municipal liability under *Monell*. Before the Court are the parties' cross-motions for summary judgment. For the reasons that follow, the Court will grant Defendants' motion on Count II, will deny Plaintiff's motion on Count II, and will deny both motions on Count I.

**I.     BACKGROUND**

    On May 8, 2009, Fry was driving his motorcycle when he was stopped by Officer Smoker for failing to use his turn signal. (Pl.'s Statement of Undisputed Facts in Supp. of Pl.'s Mot. for Partial Summ. J. [Pl.'s SOF] ¶ 12.) Officer Smoker observed that Fry's eyes were glassy and bloodshot, and he smelled alcohol on Fry's breath. (Def.'s Statement of Undisputed Facts in Supp. of Summ. J. of Defs. [Defs.' SOF] ¶ 11.) After a backup officer arrived, Officer Smoker conducted field sobriety tests on Fry, which he failed. (Defs.' SOF ¶¶ 12, 13.) Suspecting that Fry was driving

under the influence, Officer Smoker decided to transport Fry to Lancaster Regional Hospital for a blood test. (*Id.* ¶¶ 14, 16.) Officer Smoker advised Fry that he was under arrest for suspicion of driving under the influence of alcohol, handcuffed him, and placed him in the back of the police car to transport him to the hospital. (*Id.* ¶¶ 15-16; Pl.'s SOF ¶ 17.) As directed by a Manor Township Police Department policy, Officer Smoker handcuffed Fry. (Defs.' SOF ¶ 17; Defs.' SOF Ex. D [Manor Twp. Police Dep't Handcuffing Procedure].) Also pursuant to a department policy, Officer Smoker would customarily double lock handcuffs to prevent them from getting any tighter. (Manor Twp. Police Dep't Handcuffing Procedure; Defs.' SOF ¶ 19; Pl.'s SOF ¶ 37, Pl.'s SOF Ex. 3 [Officer Smoker Dep.] at 58-60.) Officer Smoker typically would visually inspect the handcuffs for tightness, sometimes sticking a finger in them, before double locking them. (Defs.' SOF ¶ 19' Pl.'s SOF ¶¶ 35, 37; Officer Smoker Dep. at 58-60.) However, Officer Smoker could not recall whether during this incident he checked the tightness in Fry's handcuffs or whether he double locked them. (Officer Smoker Dep. at 60.)

Within thirty seconds of being handcuffed, Fry was placed into Officer Smoker's patrol car. (Defs.' SOF ¶ 23.) The trip from the site of the arrest to the hospital lasted from between five and six minutes. (*Id.* ¶ 24.) After arriving at the hospital, Officer Smoker helped Fry out of the car and removed the handcuffs before they entered the hospital, and Fry was not re-handcuffed while in the hospital. (Pl.'s SOF ¶ 42; Defs.' SOF ¶¶ 27-28; Defs.' SOF Ex. A [Fry Dep.] at 37-38.) Fry was cooperative and compliant at all times during his arrest and transportation to the hospital. (Pl.'s SOF ¶¶ 20-21.) Fry never complained to Officer Smoker about the tightness of the handcuffs. (Defs.' SOF ¶ 22.) Fry later testified that the handcuffs felt tight, but that he "assumed that that's how they were supposed to be." (Defs.' SOF ¶ 21; Fry Dep. at 35.) He also testified that he did not recall feeling any

pain in his wrists, arms, or hands while he was handcuffed. (Fry Dep. at 39.)

At the hospital, Officer Smoker read Fry his *Miranda* warnings and filled out a form requiring him to ask Fry whether any pressure or force of any kind had been used against him, to which Fry answered yes. (Pl.'s SOF ¶ 46.) Officer Smoker said he customarily follows up with arrestees who answer yes to that question, though he could not recall whether he did so with Fry. (Pl.'s SOF ¶ 47; Officer Smoker Dep. at 66.) After the blood test, Fry was no longer in custody, but Officer Smoker believed that he was still intoxicated and gave Fry a ride home. (Pl.'s SOF ¶ 50; Defs.' SOF ¶ 29; Officer Smoker Dep. at 71-72.) Because Fry was no longer an arrestee, he was not handcuffed during the drive. (Pl.'s SOF ¶ 49; Defs.' SOF ¶ 30.) Officer Smoker did not discuss anything with Fry during the ride, including whether the handcuffs had been too tight, because Fry had refused to answer Officer Smoker's questions after being read his *Miranda* rights. (Pl.'s SOF ¶ 51; Officer Smoker Dep. at 72.)

The following day, on May 9, 2009, Fry went to the emergency room at Lancaster Regional Medical Center, complaining of pain in his right wrist and right thumb. (Pl.'s SOF ¶ 80; Pl.'s SOF Ex. 10 [Medical Records].) Fry's medical records indicate some numbness and tenderness, and he was treated with a splint to immobilize his right wrist, which his physician recommended Fry wear for at least three to five days. (Medical Records.) Fry went to Lancaster Orthopedic Group on May 11, complaining of tenderness and weakness in his right hand, which he said began after spending an hour in tight handcuffs. (*Id.*) Dr. Raymond Pearl recommended Fry's continued use of the splint and aspirin. (*Id.*) Dr. Pearl suspected that Fry had developed a radial sensory neuropraxia due to the compression from the handcuffs, which would resolve on its own over weeks or months, or possibly, a radial artery aneurysm or pseudoaneurysm. (*Id.*) Dr. Pearl recommended an ultrasound to rule out

any possibility of an aneurysm. Dr. Pearl later discussed the results of the ultrasound with Fry, and advised him of a hematoma, with the possibility of a thombosis or surrounding aneurysm, but recommended continued observation. (*Id.*) Throughout the summer, Fry returned for monthly follow-up visits with Dr. Pearl, during which he reported intermittent discomfort, swelling, and tenderness. (*Id.*) The office visit notes describe the symptoms as classic carpal tunnel syndrome. (*Id.*) Dr. Pearl ultimately recommended surgery, which was performed on September 29, during which a ganglion cyst was removed and Fry's carpal tunnel was released. In the follow-up notes, Fry indicated he was feeling better, and on November 11, Fry stated that he felt 100 percent improved. (*Id.*) In February 2012, Dr. Pearl provided an expert medical report after reviewing all of his treatment notes. (Pl.'s SOF Ex. 8 [Expert Medical Report of Dr. Pearl].) The report opined that the ganglion cyst could occur following trauma and that the compression of the nerve was directly related to the handcuffs. (*Id.*) However, Dr. Pearl also stated that, in his expert opinion, the carpal tunnel syndrom was likely a preexisting condition not related to the handcuff application. (*Id.*)

II.  **STANDARD OF REVIEW**

Summary judgment is appropriate when the admissible evidence fails to demonstrate a genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). When the movant does not bear the burden of persuasion at trial, it may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry its burden of persuasion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

Thereafter, the nonmoving party demonstrates a genuine issue of material fact if it provides

evidence sufficient to allow a reasonable finder of fact to find in its favor at trial. *Anderson*, 477 U.S. at 248. In reviewing the record, a court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Prowel v. Wise Bus. Forms*, 32 F.3d 768, 777 (3d Cir. 2009). The court may not, however, make credibility determinations or weigh the evidence in considering motions for summary judgment. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002). A court must apply the same standards to cross-motions for summary judgment. *Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987); *see also St. Paul Fire & Marine Ins. Co. v. Primavera Software, Inc.*, Civ. A. No. 09-3908, 2011 WL 3438077, at *3 (E.D. Pa. Aug. 5, 2011).

### III. DISCUSSION

#### A. Claims Against Manor Township

Count II of Plaintiff's Complaint alleges that Manor Township deprived Fry of his constitutional rights by its failure to train and supervise its police officers on when to handcuff a detainee and on the safe application of handcuffs, by policies and customs of failing to properly investigate or sanction police misconduct, and by policies or customs that exhibit deliberate indifference to the constitutional rights of individuals. In his motion for summary judgment, Fry also argues that Manor Township's blanket handcuffing policy violated his Fourth Amendment right to be free from excessive force.

In order to establish liability under Section 1983 against a local government unit or a supervisory official, a plaintiff must demonstrate: (1) the deprivation of a constitutional right; (2) that the action was taken pursuant to a custom or policy of the local government unit; and (3) that the

action was the cause of the deprivation. *Monell v. Dep't. of Social Servs. of N.Y.*, 436 U.S. 658, 691 (1978). Identifying a "'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403-04 (1997). An "act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Id.* at 404. Additionally, the plaintiff must show that the municipality's deliberate conduct was the "moving force" behind the injury alleged. *Id.*

Fry must demonstrate a direct causal link between a Manor Township any policy or custom and his alleged constitutional deprivation. *See City of Canton v. Harris*, 489 U.S. 378, 385 (1989). "Once a policy or custom is identified, a body may be liable only if it acted with deliberate indifference to the consequences of a policy that caused plaintiffs' harm." *Regan v. Upper Darby Twp.*, 363 F. App'x 917, 923 (3d Cir. 2010) (internal quotation marks omitted).

Fry contends that Manor Township Police Department has a written policy that requires police officers to handcuff all prisoners while being transported. (Manor Twp. Police Dep't Handcuffing Procedure.) However, Fry fails to note any cases that prohibit departmental policies to restrain all detainees when being transported. On the contrary, numerous courts in this circuit have recognized the permissibility of similar departmental policies. *See, e.g.*, *Young v. Medden*, Civ. A. No. 03-5432, 2010 WL 1628800, at *4 (E.D. Pa. Apr. 20, 2010); *United States v. Amankwaa*, Crim. A. No. 09-153-1, 2010 WL 55710, at *2 (M.D. Pa. Jan. 4, 2010); *United States v. Fenton*, Crim. A. No. 98-01J, 1998 WL 356889, at *3 (W.D. Pa. May 28, 1998). These decisions are consistent with

the Supreme Court's holding in *Graham v. Connor*, 490 U.S. 386, 396 (1989), that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion." They are also consistent with the Third Circuit's holding that the use of handcuffs must be justified by the circumstances. *Baker v. Monroe Twp.*, 50 F.3d 1186, 1193 (3d Cir. 1995) (noting use of handcuffs during investigatory stops as permissible as justified under certain circumstances). Arrest and transportation in a police vehicle justifies the use of handcuffs. *See, e.g.*, *Frazier v. City of Phila.*, 927 F. Supp. 881, 887 (E.D. Pa. 1996) (upholding departmental policy requiring all arrestees to be handcuffed with their hands behind their backs as reasonable under the Fourth Amendment). The Court finds that Manor Township's policy to handcuff all arrestees when they are being transported in a police vehicle is reasonable and does not constitute a Fourth Amendment deprivation.

Fry fails to present evidence demonstrating any failures in training on the use of handcuffs. To the contrary, there is significant evidence in the record that Officer Smoker was trained to restrain arrestees when transporting them in a police vehicle and how to visually inspect handcuffs to ensure they are not too tight and to double lock them to make sure they do not get any tighter. (Officer Smoker Dep. at 58-60, 67). "A plaintiff pressing a § 1983 claim must identify a failure to provide specific training that has a causal nexus with their injuries and must demonstrate that the absence of that specific training can reasonably be said to reflect a deliberate indifference to whether the alleged constitutional deprivations occurred." *Reitz v. County of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997). The Court finds that Plaintiff failed to demonstrate any absence of specific training that can reasonably reflect Monell Township's deliberate indifference as to whether constitutional violations occurred.

Fry also fails to present evidence that Manor Township failed to properly investigate allegations of his injury. Plaintiff presented evidence that the Manor Township Manager has in the past conducted an internal investigation when a person is injured by a police officer's conduct. However, in this case, Plaintiff demonstrated that after receiving the complaint, Manor Township Manager Barry Smith read the police report on the incident, spoke with the police chief, and decided that the police followed proper procedures. (Pl.'s SOF Ex. 4 [Smith Dep.] at 24-31.) Smith decided not to bring in outside individuals to determine whether the police procedures were proper and chose not to pursue any further investigation. (*Id.* at 29.) Barry Smith as Manor Township Manager is a policymaking official under *Monell* by virtue of his decision-making position. *Brennan v. Norton*, 350 F.3d 399, 427 (3d Cir. 2003) (noting *Monell* liability exists based on an officially adopted decision of a municipality's officer or by approval of a subordinate's decision and the basis for it). However, the Court finds that the evidence presented by Plaintiff fails to demonstrate any deliberate indifference by Manor Township in its investigation of Fry's allegations of excessive force.

The admissible evidence fails to demonstrate a genuine dispute of material fact that Fry's injury was the result of a custom or policy of Manor Township. Accordingly, the Court will grant Defendants' motion for summary judgment and deny Plaintiff's motion for summary judgment on Count II.

    **B.    Claims for Excessive Force against Officer Smoker**

        **1.    Excessive Force**

Fry also seeks damages under section 1983 for violations of his Fourth and Fourteenth Amendment rights by Officer Smoker for excessive force when handcuffing him. To obtain relief in a section 1983 action, a plaintiff must show that a defendant, acting under color of state law,

deprived him of a right secured by the Constitution and laws of the United States. *See, e.g.*, *Harvey v. Plaints Twp. Police Dep't*, 421 F.3d 185, 189 (3d Cir. 2005) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)).

The Third Circuit has held that overly tight handcuffs may constitute excessive force. *Kopec v. Tate*, 361 F.3d 772, 777 (3d Cir. 2004). In *Kopec*, a police officer applied excessively tight handcuffs to Kopec, who had been arrested for disorderly conduct after being caught frolicking on a frozen lake with his girlfriend. *Kopec*, 361 F.3d at 774. Kopec repeatedly requested that the handcuffs be loosened, and the officer did so after ten minutes of complaints. *Id.* at 777. Kopec alleged nerve damage to his right wrist as a result of the excessive force. The Third Circuit emphasized that the officer "faced rather benign circumstances that hardly justified his failure to respond more promptly to Kopec's entreaties, at least to the extent to ascertain if the handcuffs were too tight. [The officer] was not, after all, in the midst of a dangerous situation involving a serious crime or armed criminals." *Id.* However, the *Kopec* court emphasized that its opinion was not to be overread so as to not "open the floodgates to a torrent of handcuff claims." *Id.*

The Third Circuit, in *Gilles v. Davis*, 427 F.3d 197, 208 (3d Cir. 2005), distinguished *Kopec* under circumstances where it was unclear whether the plaintiff had complained that his handcuffs were too tight, but the district court had viewed the videotape of the arrest and found that the plaintiff "demonstrated no expression or signs of discomfort and the time he was handcuffed." The *Gilles* court emphasized that the plaintiff had not sought nor received medical treatment after the fact. *Gilles*, 427 F.3d at 207. The *Gilles* court upheld a grant of summary judgment based in part on the district court's finding that Gilles did not see any doctor relating to the incident until two and a half years after the arrest, and the court held that there was insufficient evidence of excessive force by

9


handcuffing.

To make out an excessive force claim, Fry must show that he was seized and that the force used to effectuate his seizure was unreasonable. *See Cianfrani v. Borough of Clifton Heights*, Civ A. No. 09-46, 2010 WL 4159176, at *9 (E.D. Pa. Oct. 21, 2010) (citing *Kopec*, 361 F.3d at 776). Courts are to determine the reasonableness of a seizure based on the specific facts and circumstances of the case. *Graham v. Connor*, 490 U.S. 386, 396 (1989). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* Defendants do not dispute that Fry was seized, as Officer Smoker stated that Fry was under arrest until after he took the blood test at the hospital. (Officer Smoker Dep. at 55.) However, Defendants argues that there could not have been an unreasonable use of force because Fry did not complain about the tightness of the handcuffs.

Defendants' assertion that an arrestee must complain about his overly tight handcuffs in order to later be able to make out an excessive force claim creates an obstacle not required by the Third Circuit in *Kopec* or *Gilles*. There are numerous reasons why arrestees may not complain to arresting officers that their handcuffs are too tight, such as intimidation by the officer, a language barrier, the lack of knowledge that complaining does not constitute a waiver of *Miranda* rights, not feeling immediate pain due to intoxication, not knowing how tight handcuffs are supposed to be, or not realizing the extent of the injury at the time of the handcuffing. Police officers are trained how to safely apply handcuffs to a detainee, yet Defendants' proposed requirement that a detainee must complain about the tightness of handcuffs for it to constitute unreasonable force shifts the responsibility of understanding the safe application of handcuffs from the trained officer to the detainee. However, while the Third Circuit has never required that the plaintiff complain at the time

of handcuffing for a plaintiff to set forth an excessive force claim, the absence of a complaint is one factor the jury may consider in determining whether Officer Smoker used excessive force in handcuffing Fry.

Here, Officer Smoker arrested Fry for driving under the influence of alcohol, and he arrested Fry and decided to transport him to the hospital for a blood test. Upon arresting him, Officer Smoker handcuffed Fry pursuant to departmental policy, placed him in the police vehicle, drove to the hospital, where Officer Smoker then helped Fry out of the car and removed the handcuffs. The entire incident lasted approximately six to seven minutes. Fry did not complain about the tightness of the handcuffs. Similar to *Kopec*, Officer Smoker faced "benign circumstances" where he had the opportunity to visually inspect the handcuffs at the time of application to ensure they were not too tight. Officer Smoker was merely transporting a suspected drunk driver to the hospital for a blood test, which is hardly an urgent and dangerous situation requiring skipping the step of visually inspecting the handcuffs to ensure a finger's worth of space in the handcuffs prior to double-locking them. Indeed, Officer Smoker claims that he customarily visually inspects handcuffs upon application, although he could not recall whether he did so on this occasion.

Defendants seek to distinguish *Kopec* by emphasizing that here, Fry did not complain to Officer Smoker or request that the handcuffs be loosened. Relying on *Clifton v. Borough of Eddystone*, __ F. Supp. 2d ___, 2011 WL 4712210 (E.D. Pa. Oct. 7, 2011), they argue that a court cannot find excessive force for overly tight handcuffs when the plaintiff failed to complain about the tightness or did not exhibit obvious visible indicators of pain. However, *Clifton* is inapplicable here because in that case, the plaintiff did not present any evidence that her alleged injuries required medical treatment, and thus the court relied on *Gilles* rather than *Kopec*. *Id.*, at *10. Here, unlike in

*Gilles* or *Clifton*, Fry has produced substantial evidence of serious injuries, including pain and numbness in his right wrist and thumb, which began the day after Officer Smoker's application of handcuffs and required six months of medical treatment and surgery, as well as an expert report linking the injury to overly tight handcuffs that compressed Fry's nerve. Thus, the Court finds that Fry has presented sufficient evidence to support his allegations of injury such that a reasonable jury could find that Officer Smoker's application of handcuffs led to Fry's injury and constituted excessive force.

### 2.     Qualified Immunity

In the alternative, Defendants argue that Officer Smoker is entitled to qualified immunity on Plaintiff's excessive force claim. "Qualified immunity insulates from civil liability government officials performing discretionary functions insofar as 'their actions could reasonably have been thought consistent with the rights they are alleged to have violated.'" *Forbes v. Twp. of Lower Merion*, 313 F.3d 144, 148 (3d Cir. 2002) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)). The Court must evaluate the law relevant to the official's behavior and determine whether the official could have believed that his actions were justified by law. *Id.* For a plaintiff to overcome a defense of qualified immunity, (1) the facts viewed in the light most favorable to plaintiff must show the officer's conduct violated a constitutional right, and (2) the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates the right. *Id.* The purpose of this doctrine is "to exclude the 'plainly incompetent' and 'those who knowingly violate the law' while accommodating reasonable 'mistaken judgments.'" *Id.* (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)). Consequently, if an official could have reasonably believed that his actions were lawful, regardless of whether they were, then the official receives immunity.

*Anderson*, 483 U.S. at 638.

Under the first prong of this analysis, the Court has already found that when viewing the evidence in the light most favorable to Fry, he has presented evidence sufficient to establish a violation of a clearly established right. Under the second prong, the plaintiff must demonstrate that the contours of his right to be free from excessive force are sufficiently clear that a reasonable police officer would understand that his actions violated that right. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

The Court finds that Fry has made a sufficient showing that the particularized right that he alleges Officer Smoker violated was clearly established at the time of the alleged violation. The Third Circuit spoke clearly in *Kopec* in 2004 that overly tight handcuffs can constitute excessive force. Defendants seek to muddy the waters by arguing that a plaintiff must complain about the tightness of handcuffs for it to constitute excessive force, however, the Third Circuit has never demanded such action by a plaintiff. Rather, the law is clear: individuals have a constitutional right to be free from excessive force at the time of an arrest. The "particularized right not to be locked into excessively tight handcuffs . . . was clearly established since at least the year 2000, the year in which the events of [*Kopec*] took place. *Tate v. W. Norriton Twp.*, 545 F. Supp. 2d 480, 489 (E.D. Pa. 2008) (denying summary judgment and finding qualified immunity unavailable when an officer ignored the complaints of a plaintiff that his handcuffs were too tight and he later was diagnosed with a contusion and fitted with a splint that he wore for two months). Furthermore, Fry produced evidence that demonstrates that Officer Smoker was trained on appropriate application of handcuffs

through visual inspection to ensure they are not too tight and that Manor Township policy required double locking handcuffs to prevent further tightening, which bolsters Plaintiff's argument that a reasonable police officer understands that excessively tight handcuffs violates an individual's constitutional rights.

Because Plaintiff has presented sufficient evidence to establish a genuine dispute of material fact and because and Fry has overcome Officer Smoker's defense of qualified immunity, the Court will deny summary judgment on Count I.

**IV.    CONCLUSION**

The parties have produced evidence sufficient to demonstrate a genuine dispute of material fact as to Count I, but Plaintiff has failed to establish a genuine issue as to Count II. Accordingly, the Court will deny both parties' motions on Count I, will grant Defendants' motion on Count II, and will deny Plaintiff's motion on Count II. An Order consistent with this Memorandum will be docketed separately.